STATE OF CONNECTICUT *v.* KATRINA WOODS
(9062)

DALY, FOTI and LANDAU, Js.

Argued April 30—decision released July 16, 1991

*Denise Dishongh,* with whom was *Louis Avitabile,* for the appellant (defendant).

*Jack W. Fischer,* deputy assistant state's attorney, with whom, on the brief, were *John Connolly,* state's attorney, and *Corinne Klatt,* assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction of assault in the first degree in violation of General Statutes § 53a-59 (a) (2) that was rendered after a jury trial.[1] She claims that the judgment of conviction must be reversed because (1) there was insufficient evidence to support her conviction, and (2) the trial court improperly denied her request for a specific unanimity instruction. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On June 6, 1989, the victim, Kendra Fields, age 17, and her infant daughter, were living in a Waterbury apartment with her aunt, her aunt's daughter, the defendant, and three other adults. On that date, Fields and the defendant argued for two hours about food stamps. Fields left with her daughter and returned about 11 p.m. to find herself and three others locked

---

[1] General Statutes § 53a-59 (a) provides: "A person is guilty of assault in the first degree when . . . (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person . . . ."

out of the apartment. She called the police, who arranged to have the project's maintenance department open the door. The police briefly entered the apartment and found it empty. After the police left, the defendant emerged from a closet where she had been hiding. At about 6 a.m., Fields went to sleep in a room with three other persons. At about 8 a.m., she felt a burning sensation on her face, ear, neck, the back of her neck, hand and shoulder. She jumped up and ran to a mirror. As she wiped her face, pieces of her skin came off. While screaming in pain, she observed that there were grits on the floor next to the bed, and that they had burned the rug. She then ran downstairs and out of the house. As she passed the kitchen, she noticed there was a pot of grits on the stove and a bowl and pitcher lying on the floor by the back door.

Fields was taken to a hospital by ambulance. She returned to the apartment later that day to make arrangements for the care of her daughter. Before returning to the hospital, she gave the police a written statement and had photographs taken. She returned to the hospital where she remained for about two weeks.

As a result of her injuries, Fields underwent therapy twice a day for two weeks. She also received electric shock treatment to prevent the loss of one of her ears. She sustained lasting marks on her left arm, right arm, right hand, right side of her neck and right shoulder, and she still complains of poor hearing in one ear.

After Fields was released from the hospital, she returned to the apartment. The defendant, however, no longer lived there. Sometime during July and August, 1989, the defendant telephoned Fields and asked her if she was going to press charges. Fields replied affirmatively and asked the defendant why she

had burned her. The defendant replied that she had been angry because Fields had called the police the night before and that she had gotten the idea about the grits from a magazine. The defendant also said that she was "high" when she burned Fields, and that she would not have done it if Fields' daughter had been in the bed at the time. During this period of time, the defendant called Fields approximately eight times to apologize and to say that she had not meant to do it. Each time, the defendant asked Fields to drop the charges.

The defendant first claims that there was insufficient evidence of either of the two forms of mayhem as articulated in the assault statute, General Statutes § 53a-59 (a) (2), to support a conviction, and that, therefore, an acquittal on that offense is required.[2] The defendant argues in the alternative that there was insufficient evidence of at least one of the two forms of mayhem, and that she is entitled to a new trial on the remaining form.

The defendant's first argument on appeal is founded on the proposition that § 53a-59 (a) (2) contains two separate and distinct offenses. She argues that, as developed at common law and restated in § 53a-59 (a) (2), mayhem involves two conceptually distinct forms, namely, (1) acting with the specific intent permanently to destroy, amputate or disable a member or organ of the body, the actor causes the specific and intended injury, or (2) acting with the specific intent to disfigure, seriously and permanently, the actor causes the spe-

---

[2] The defendant does not contest that her included conviction of second degree assault pursuant to General Statutes § 53a-60 (a) (1), which the jury must have found as part of its verdict, is proper and may be affirmed by this court. Because the jury resolved the identity dispute against her, the defendant concedes that she cannot on appeal contest this aspect of her conviction.

cific and intended injury. She claims that there was insufficient evidence under either of these two forms and that the trial court improperly allowed the jury to mix and match intents and results. The defendant essentially argues that it would be improper for the jury to convict the defendant if she committed an act that resulted in one form of first degree assault, while intending to commit the other.

Although there were two common law forms of mayhem, General Statutes § 53a-59 (a) (2) is a compilation of several previous statutes to form one grade of assault, and not a ratification of the common law of mayhem. The common law offenses of mayhem and malicious disfigurement were distinct and separate: mayhem required a general intent to commit the act, and malicious disfigurement required a specific intent. Section 53a-59 (a) (2) requires a specific intent, and also protects the organs of the body, which were not covered by the common law definitions of either mayhem or malicious disfigurement. Thus, the two separate forms of crime as they were distinguished under the common law are neither controlling nor relevant in construing our statute.

The defendant argues that our statute by its own terms can be seen clearly to prohibit two different types of mayhem. We disagree. Our legislature, in enacting § 53a-59 (a) (2), intended to punish any act on a person intended either to disfigure that person seriously and permanently or to destroy, amputate or disable a member or organ of that person's body, which causes such injury to that person or a third person.[3] This statute defines a single crime consisting of a single act that is intended to and does cause a permanent disfigure-

---

[3] Although the charging document used the conjunctive word "and" in describing the offense, the court clearly explained that the statutory definition, which uses the disjunctive word "or," controlled.

ment or a destruction, amputation or disabling of an organ or member of another person's body. The statute requires a specific intent to cause an injury of either nature; the words "such injury" do not require that the actor cause the specific injury intended. One who acts, therefore, with the intent to cause the injuries as listed and causes an injury of either quality may be found guilty under this statute. Although this statute describes two types of specific intent, i.e., to disfigure seriously and permanently, or to destroy, amputate or disable permanently a member or an organ of the body, it is a single crime that is completed by causing an injury consistent with either listed intent.

The defendant also claims that the evidence was insufficient both as to intent and as to resulting injury to sustain the conviction. Again, we disagree.

"In reviewing a sufficiency of evidence claim on appeal the question presented is whether, viewing the evidence favorably to sustaining the verdict, the trier could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." *State* v. *Zayas,* 195 Conn. 611, 620, 490 A.2d 68 (1985). When we apply this standard, there is no question that the evidence established such proof beyond a reasonable doubt.

The jury could reasonably have found that the defendant poured a pot of extremely hot grits on the victim's face and upper body as she lay sleeping, resulting in permanent injury to her ear and skin. Given Fields' testimony, the medical evidence and the jury's observations of the marks on the victim's skin, there was sufficient evidence of serious and permanent disfigurement.

The defendant concedes that the skin is an organ for purposes of the statute. She questions whether the ear is a member of the body but admits that the ear is an

organ. There was abundant evidence of permanent destruction or disabling of the ear and the skin of the victim. There was medical testimony that the burns had caused permanent damage to Fields' skin, and testimony, if found credible by the jury, that she could not hear well with her injured ear, is sufficient evidence of permanent injury.

Finally, the defendant argues that there was insufficient evidence of the specific intent to cause serious and permanent disfigurement and insufficient evidence of specific intent to cause permanent destruction or permanent disability of any member or any organ of the body. Intent may be inferred from the conduct of the accused. *State* v. *Carpenter,* 214 Conn. 77, 82, 570 A.2d 203 (1990); *State* v. *Cofone,* 164 Conn. 162, 164, 319 A.2d 381 (1972). Ordinarily, the intent of the actor is a question for the trier of fact. *State* v. *Avcollie,* 178 Conn. 450, 466, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980). In this case, the evidence strongly pointed to the likelihood that the defendant intended permanently to destroy or disable an organ or member of the victim by pouring hot grits on Fields' face while she slept. The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. *State* v. *Carpenter,* supra, 83.

The defendant's final claim is that the trial court improperly denied her request for a specific unanimity instruction. Because we have concluded that there are not two conceptually distinct forms of mayhem with each form requiring a concurrence between the specific mental state and the intended result, a specific unanimity instruction is not required.

The judgment is affirmed.

In this opinion the other judges concurred.